RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0019p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

PERRY L. ELAM,

           *Plaintiff-Appellant,*

    *v.*

DHANANJAI MENZIES, M.D.,

           *Defendant-Appellee.*

No. 09-5360

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 07-00253—Danny C. Reeves, District Judge.

Argued:  November 18, 2009

Decided and Filed:  February 4, 2010

Before:  MERRITT, CLAY, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Sara B. Gregory, CARROLL & TURNER, P.S.C., Monticello, Kentucky, for Appellant.  Bradley A. Case, DINSMORE & SHOHL LLP, Louisville, Kentucky, for Appellee. **ON BRIEF:**  Sara B. Gregory, Lance W. Turner, Thomas E. Carroll, CARROLL & TURNER, P.S.C., Monticello, Kentucky, for Appellant.  Bradley A. Case, Frank P. Doheny, Jr., Michael C. Merrick, DINSMORE & SHOHL LLP, Louisville, Kentucky, for Appellee.

    MERRITT, J., delivered the opinion of the court, in which CLAY, J., joined. McKEAGUE, J. (pp. 13-19), delivered a separate dissenting opinion.

_____

## OPINION

_____

    MERRITT, Circuit Judge.  Plaintiff, Perry Elam, sued Defendant, Dr. Dhananjai Menzies, on June 22, 2007, alleging negligence in a heart operation that Dr. Menzies performed on Elam on July 21, 2005.  After removing this action to federal court under

diversity jurisdiction, Dr. Menzies sought summary judgment, arguing that Kentucky's one year statute of limitations for medical malpractice suits had run. The District Court granted summary judgment for Dr. Menzies. The key issue on appeal is when Elam discovered his injury. We find that the record evidence of events and conversations following Elam's procedure creates a factual dispute as to when Elam discovered that Dr. Menzies may have injured him. Because this dispute should be resolved by a jury, summary judgment was inappropriate.

## I. SUMMARY OF FACTS

Complaining of shortness of breath, chest pains, and extreme fatigue, in July of 2005, Plaintiff Elam visited Dr. Dhananjai Menzies, a board certified, cardiac surgeon. After administering a stress test and cardiac catheterization, Dr. Menzies discovered multiple lesions on Elam's left anterior descending artery. Dr. Menzies presented Elam with two options: a stenting procedure or bypass surgery. He recommended the stenting procedure and Elam agreed, expressing a reluctance to undergo an invasive bypass surgery operation. Dr. Menzies informed Elam that if the procedure was not successful he may have to undergo the bypass surgery. Thereafter, Dr. Menzies placed three stents in the affected artery.

Initially, the procedure appeared to be a success. But in August of 2005, Elam visited Dr. Menzies' office complaining once again of chest pain. Elam alleges that Dr. Menzies said that "it was probably scar tissue and stuff like that." Elam continued to experience pain. Because Dr. Menzies had moved from Kentucky to New York around this time, Elam began seeing Dr. Khaled Selah. In October of 2005, Dr. Selah referred Elam to Dr. Larry Breeding at Central Baptist Hospital in Lexington, Kentucky.

On October 20, 2005, Dr. Breeding performed a cardiac catheterization on Elam. Immediately following this procedure – while Elam was lying on a gurney – Dr. Breeding had a conversation with Elam, his wife, and his son. The exact contents of the conversation are highly disputed. It is clear, however, that Dr. Breeding advised Elam to have bypass surgery. Four days later, Elam underwent quadruple bypass surgery.

Some time following his surgery, Elam saw television commercials that caused him to question whether there might have been problems with his stents. In late 2006, he met

with a lawyer. The lawyer received Elam's medical records and submitted them to an expert for review.

On June 22, 2007, eighteen months after his conversation with Dr. Breeding immediately after the second catheterization, Elam filed suit in Kentucky state court alleging that Dr. Menzies was negligent in the performance of his cardiac catheterization and the placement of stents. Elam sought damages for medical expenses, loss of income and income-earning capacity, and pain and suffering. Dr. Menzies removed the action to federal court on the basis of diversity jurisdiction. Thereafter, Dr. Menzies filed two motions for summary judgement. The District Court granted summary judgement on the grounds that Elam did not file suit within the one-year Kentucky statute of limitations for medical malpractice claims. Elam petitioned the District Court under Federal Rule of Civil Procedure 59(e) to alter, amend or vacate its previous grant of summary judgment. The District Court denied this motion. We review both decisions of the District Court *de novo*. *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001); *see also Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998) ("[w]hen [a] Rule 59(e) motion seeks review of a grant of summary judgment . . . we apply a *de novo* standard of review.").

## II. ANALYSIS

Under Kentucky law, an "action against a physician [or] surgeon" for "negligence or malpractice" must be "commenced within one (1) year after the cause of action accrued." KY. REV. STAT. ANN. § 413.140(1)(e). The cause of action shall be deemed to accrue "at the time the injury is first discovered or in the exercise of reasonable care should have been discovered." KY. REV. STAT. ANN. § 413.140(2).[1]

The Kentucky Supreme Court has explained this discovery rule: "[T]he statute begins to run on the date of the discovery of the injury, or from the date it should, in the exercise of ordinary care and diligence, have been discovered." *Wiseman v. Alliant*

---

[1] The parties stipulate that our application of Kentucky's discovery rule is governed by state law. *See generally Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). This stipulation comports with our prior reliance on state court cases when interpreting that state's discovery rule. *See, e.g., Michals v. Baxter Healthcare Corp.*, 289 F.3d 402, 406 (6th Cir. 2002); *Twee Jonge Gezellen, Ltd. v. Owens-Illinois, Inc.*, 238 F. App'x 159, 162 (6th Cir. 2007); *Coate v. Montgomery County*, 234 F.3d 1267, No. 99-6123, 2000 WL 1648131 at *3 (6th Cir. 2000) (unpublished decision).

*Hospitals, Inc.*, 37 S.W.3d 709, 712 (Ky. 2000) (citation omitted).  The plaintiff must have a "basis for a claim before the statute of limitations  begins to run."  *Id.*  The "knowledge necessary to trigger the statute is two-pronged; one must know: (1) he has been wronged; and (2) by whom the wrong has been committed."  *Id.*  Although what the plaintiff actually knew often triggers discovery, the rule can also be satisfied by what the plaintiff should have known.  *Id.; see also Davis v. All Care Medical, Inc.*, 986 S.W.2d 902, 906 (Ky. 1999) (noting in dicta that the discovery rule "uses a reasonably prudent person test").  In constructing knowledge, however, a court must give special consideration to the patient's perspective because "[o]ne who possesses no medical knowledge should not be held responsible for discovering an injury based on the wrongful act of a physician."  *Wiseman*, 37 S.W.3d at 712-13.  Elam filed his lawsuit on June 22, 2007, so if he discovered the injury before June 21, 2006, this action is barred.

In Kentucky, when there is a disputed issue of fact as to when a plaintiff "discovered or should have discovered" his cause of action, that factual issue should be resolved by the jury in cases in which the plaintiff has asked for a jury.  Although the validity of the defense of statute of limitations is determined by the court as a matter of law, where "there is a factual  issue upon which the application of the statute depends, it is proper to submit the question to the jury."  *Lynn Mining  Co. v. Kelly*, 394 S.W.2d 755, 759 (Ky. 1965)); *see generally* 13 Ky. Prac. Tort Law § 10:39 (2009).  We note that, despite the parties' stipulation that Kentucky law governs, we have previously held that when a federal court sits in diversity, allocation of functions between judge and jury must be made by recourse to federal law.  *In re Lewis*, 845 F.2d 624, 628 (6th Cir. 1988) (citing *Magenau v. Aetna Freight Lines*, 360 U.S. 273, 278 (1959)).  Federal law does not present a conflict with Kentucky law.  *Byrd v. Blue Ridge Rural Elec. Co-op., Inc.,* 356 U.S. 525, 537-38 (1958) ("An essential characteristic of [the federal] system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury and, under the influence – if not the command – of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury."); *see generally* 35B C.J.S. Federal Civil Procedure § 960 (2009).  Thus, both Kentucky law

and federal procedural law used in diversity cases specify that disputed issues of fact respecting the running of a statute of limitations should be resolved by a jury.

According to its opinion and order of March 17, 2009, the District Court's denial of Elam's Rule 59(e) motion was based on Elam knowing three facts before June 21, 2006: (1) Elam was aware that unsuccessful stent surgery would necessitate bypass surgery; (2) Elam was informed by Dr. Breeding that the stenting procedure may not have been properly performed; (3) Elam saw advertisements on television pertaining to the harmful effects of stents used in his catheterization procedure.[2]

### A.  The Bypass Surgery

The District Court based its decision in part on the fact that Elam was aware that an unsuccessful stenting procedure by Dr. Menzies would necessitate bypass surgery. This was error because there is evidence in the record that Elam may have required a bypass even if there had been a successful stenting procedure.  As Elam understood it, the stents were a first attempt to fix the blockages in his coronary arteries.[3]  "[O]ften the patient cannot know whether the undesirable outcome is simply an unfortunate result of proficient medical care or whether it is the consequence of substandard treatment." *Harrison v. Valentine*, 184 S.W.3d 521, 524 (Ky. 2005).  The necessity of the bypass surgery does not, in itself, demonstrate that Elam discovered or should have discovered Dr. Menzies' potential malpractice.

### B.  The Conversation with Dr. Breeding

The District Court primarily relied on the October 20, 2005, conversation with Dr. Breeding.  Whether that conversation should have enabled Elam to discover Dr. Menzies' potential malpractice is disputed.  We note at the outset that while there is nothing in the record demonstrating that Elam was impaired during this conversation,

---

[2]There had been some confusion as to when Elam first visited his lawyer, but Elam has since presented evidence that he first consulted an attorney in late 2006, well within the statutory period.

[3]When asked if, "[b]efore he started the stent process, did Dr. Menzies speak with you about an option of bypass surgery," Elam replied, "[h]e said if it couldn't be stented, it would result in bypass surgery."  (Elam. Dep. 68.)

the setting – with the patient still lying on the gurney  immediately following local anesthesia and a cardiac catheterization – was certainly less than an ideal setting for the brain to fully comprehend important medical and legal information.

Elam's recollection of the conversation with Dr. Breeding contains statements from which a reasonable juror could find that Elam should have discovered Dr. Menzies' potential malpractice.  Elam stated, "I just remember that he told me that some stents were placed in a place that shouldn't [sic] have been placed.  And that was the result, that I was going to have open heart surgery."  When asked if he understood Dr. Breeding "to be critical of what Dr. Menzies had done with the stents," Elam responded, "He seemed to be, a little bit. . . . But he didn't throw nobody under the bus whatsoever." (Elam Dep. 104-06.)

On the other hand, Elam's recollection also contains several statements from which a juror could find that Elam should not have discovered Dr. Menzies' potential malpractice because he reasonably believed that he needed open heart surgery because the stents had become obstructed by blockage through no fault of Dr. Menzies.  Asked if he had formed a belief that his problems "were related to something that Dr. Menzies had done," Elam replied: "No, I didn't form a belief at all.  My wife and I talked to it in detail, you know, about that I could have had more blockage.  And we didn't have a clue, you know, what was going on."  When asked to clarify if he understood the stents to be in the wrong place, Elam replied, "Well, he said they were placed – I can't – the main artery comes down, and then he said when you've got two vessels going together, that you can't place two stents together, some way or another.  He used medical terms, and I didn't understand all the medical terms or whatever, you know."  When asked directly if he suspected that Dr. Menzies "may have done something wrong" in caring for him, Elam responded, "I didn't never suspect.  I told you that I thought the world of Dr. Menzies." (Elam. Dep. 106-08.)

The recollections of two eyewitnesses to the conversation – Elam's wife and son – further compound the dispute.  Elam's son, Wesley, stated, "I'm wanting to say that he said that the stent was placed in the wrong place to start with, that was what would

cause this blockage to occur." (Wesley Elam Dep. 18-19.) Elam's wife, Randi, on the other hand, was not sure if Dr. Breeding was "saying that the stents were contributing to the problem or taking, had not taken care of the problem." (Randi Elam Dep. 49.)

Dr. Menzies' counsel elected not to depose Dr. Breeding, so we do not have the benefit of his recollection of the conversation.[4] While either party could have taken this deposition, it was particularly incumbent upon Dr. Menzies – as the party asserting the defense – to do so. The absence of this crucial testimony raises an inference that Dr. Breeding's testimony would have been harmful to Dr. Menzies. Some precedent exists suggesting that no adverse inference may be drawn from the failure to depose a witness who was equally available to both parties. *See, e.g., Whitcomb v. Whitcomb*, 267 S.W.2d 400, 402 (Ky. 1954). But a witness is not considered "equally available" if, as in this case, the witness has special knowledge of relevant facts for the party with the burden of proof. *See Welch v. L.R. Cooke Chevrolet Co.,* 236 S.W.2d 690, 691-92 (Ky. 1950) (presumption adverse to party with burden of proof when neither party produced ex-employee who was only witness to fire); *see also Kostelec v. State Farm Fire and Cas. Co.*, 64 F.3d 1220, 1229 (8th Cir. 1995) (noting that federal courts have softened the definition of "equal availability").

Furthermore, "the more logical view is that the failure to produce is *open* to an inference *against both parties*, the particular strength of the inference against each depending on the circumstances." 2 J. Wigmore, Evidence 206-08 (J. Chadbourn ed., 1979) (emphasis in original) (cited favorably in dicta in *Tyler v. White*, 811 F.2d 1204, 1207 (8th Cir. 1987)). Because we must draw all inferences in favor of Elam, and because Dr. Menzies has the burden of proof to show that Dr. Breeding's comments triggered the discovery rule, we may draw an inference that Dr. Breeding's testimony would have been adverse to Dr. Menzies. *See also Welsh v. U.S.*, 844 F.2d 1239, 1245 (6th Cir. 1988), *overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009) (recognizing that the "drawing of inferences adverse to the defendant based on

---

[4]At oral argument, we inquired whether Dr. Menzies' counsel could have deposed Dr. Breeding as a fact witness, and he responded, "That's correct . . . but I didn't have any reason to take his deposition."

defendant's failure to produce evidence that was within its control finds general support in Kentucky case law"); 2 McCormick On Evidence § 264 (6th ed.) ("When it would be natural under the circumstances for a party to call a particular witness . . . and the party fails to do so, tradition has allowed the adversary to use this failure as the basis for invoking an adverse inference.").

Neither of the two cases most extensively briefed by the parties is particularly helpful in determining when a factual dispute is significant enough to bar summary judgment in Kentucky. In *Wiseman*, *supra*, relied on by Elam, the court found the plaintiff's claim against a doctor who left a surgical instrument inside of her was not time barred. In that case, however, the patient's doctors misdiagnosed her pain as the result of a broken tail bone, delaying her discovery of the instrument. 37 S.W.3d at 710. There was no disputed conversation in *Wiseman* analogous to the one that took place between Elam and Dr. Breeding. In *Vannoy v. Milum*, 171 S.W.3d 745 (Ky. Ct. App. 2005), relied on by Dr. Menzies and the District Court, it was undisputed that the patient was aware that the source of his injury was related to his antibiotic therapy. 171 S.W.3d at 747-50. Hence, *Vannoy* is not instructive when, as in the present case, it is disputed when the patient became aware that he had an injury.

A recent, unpublished decision from the Court of Appeals of Kentucky is much more informative as to how a Kentucky court conducts discovery rule analysis at the summary judgment phase.[5] In *Van Landingham v. Georgia Pacific Corp.*, No. 2007-CA-002601-MR, 2009 WL 2475258 (Ky. Ct. App. Aug. 14, 2009), a subcontractor filed suit against his former employer after discovering benign plaques caused by asbestos on his lungs. The defendant argued that the statute of limitations barred the suit. There was significant evidence in the record that the plaintiff knew his plaques had been caused by asbestos more a than a year before he filed suit when, during a coronary artery bypass graft, the plaintiff's surgeon noticed the plaques. Not only did the surgeon testify that

---

[5]In Kentucky, while unpublished opinions cannot be cited as binding precedent, unpublished appellate decisions decided after 2003 "may be cited for consideration by the court if there is no published opinion that would adequately address the issue before the court." Kentucky Rules of Civil Procedure 76.28(4). We cite the case for its persuasive value in predicting how a Kentucky court would decide this issue.

it was normal practice for him to tell patients that such plaques were likely caused by asbestos, but his primary physician found a notation in his records questioning whether asbestosis had been found during the heart surgery.  The primary physician testified that he would not have made such a notation had it not been provided by the surgeon or the plaintiff.  Notwithstanding, the court found  that a factual dispute existed as to what the subcontractor knew at the time the plaques were removed and what exactly his doctors told him.  The court emphasized that it was "required to resolve all factual inferences" in favor of the subcontractor and that the record did not "definitively show" that the plaintiff knew of his injury.  The court reversed summary judgment and  found the dispute proper to send to a jury.  *Id.* at *3.

The defendant in *Van Landingham* presented far more evidence that the plaintiff should have known of his injury than Dr. Menzies has proffered here.  Furthermore, the defendant in *Van Landingham* lacked any testimony – like that of Elam's wife – to corroborate his description of his state of mind, and his defense was not missing the deposition of a key witness.  Hence, while not binding, *Van Landingham* reinforces our confidence that a Kentucky court would find a factual dispute as to when Elam discovered his injury.

The driving force of our decision is the summary judgment standard, which requires us to draw all reasonable inferences in favor of Elam.  Taking into account the reasonable inferences that Elam believed he needed open heart surgery because the stents had become obstructed, the conflicting testimony of Elam's son and wife, and the absence of Dr. Breeding's testimony, we find the record sufficient to call into question whether Elam should have known he had a claim against Dr. Menzies.  Therefore, the application of the discovery rule turns on a factual dispute, and it is proper to submit the question to a jury.

### C. The Television Advertisements

At some point after his bypass surgery, Elam saw television advertisements pertaining to the possible harmful effects of stents and advising that individuals who had certain types of stents may have a legal claim. In its March 17 order, the District Court cited the television advertisements as a relevant factor for finding that the statute of limitations had run. In its original dismissal of Elam's claim, however, the District Court did not analyze the effect of television ads on Elam's state of mind or on the statute of limitations. It does not seem likely that this was a particularly weighty factor for the District Court, so we will mention only three reasons why we accord these television commercials little or no weight.

First, television commercials – while potentially informative – cannot be trusted. Typically the information contained therein seeks to persuade the viewer to purchase a product or service. We hesitate to find that the viewing of a television commercial was sufficient to trigger any discovery rule. Neither Dr. Menzies nor the District Court points to any case law to support such a finding, and we are disinclined to do so in this case. We have not been able to view the commercial in question because it is not part of the record.

Second, Elam claimed that the television ads concerned possible malfunctions in medicated stents. It does not follow that the ads alerted Elam to a potential medical malpractice claim. At most, the ads arguably informed Elam of a potential products liability action against the manufacturer of his stents. In no way did the ads – as described in the record – inform Elam that Dr. Menzies negligently placed his stents.

Finally, it simply is not clear when Elam actually saw the advertisements.[6] Drawing inferences in favor of Elam, he did not see the advertisements before June 20, 2006, and they cannot have triggered the statute of limitations early enough to time-bar his suit.

---

[6]At different points in his deposition, Elam testified that he saw a TV add in "[e]arly 2006, probably"; "[i]n 2006"; "I don't know"; and, "I saw it several times you know. And I don't recollect." (Elam Dep. 123-25.)

Given Elam's lack of medical knowledge, the trust and confidence inherent in the doctor-patient relationship, the unreliability of television advertisements, the content of the commercials, and the uncertain date at which Elam first viewed them, it is inappropriate to speculate that Elam knew or should have known of Dr. Menzies' potential malpractice from these television advertisements.

### D.  Cumulative Effect

We have rejected each of the three factors the District Court cited as dispositive – the bypass surgery, the conversation with Dr. Breeding, and the television commercials.  We also reject any argument that their cumulative effect was sufficient to trigger the discovery rule.  Each individual factor is sufficiently weak such that their totality does not alter our analysis.  Moreover, the bypass surgery and Dr. Breeding's comments are sufficiently interconnected that the same inferences prevent them from warranting summary judgment, whether considered separately or together.

Our dissenting colleague basically argues that the one statement that Elam quotes Dr. Breeding as saying – "I just remember that he told me that some stents were placed in a place that shouldn't have been placed" (Elam. Dep. 104) – starts the running of the statute of limitation and that nothing else is really significant.  The Kentucky Supreme Court, however, says that "one must know . . . he has been wronged," and this knowledge should not be presumed, as the dissent argues, by "[o]ne who possesses no medical knowledge." *Wiseman*, *supra*, at 712-13.  In light of Elam's repeated testimony that he did not think he had been wronged, a jury should decide when the statute begins to run in accordance with Kentucky law and the Seventh Amendment requiring a jury trial in civil cases at law.

### III.  CONCLUSION

In light of the differences in testimony between Elam, his wife, and his son, the absence of Dr. Breeding's testimony, and the various inferences that a factfinder might make as to Elam's knowledge and state of mind, we find there is a factual dispute as to whether Elam knew or should have known he had a claim after the conversation with Dr.

Breeding.   This issue should, therefore, be referred to the jury.   We, therefore, **REVERSE** the District Court, **VACATE** the summary judgment order, and **REMAND** for further proceedings consistent with this opinion.

———————————

**DISSENT**

———————————

McKEAGUE, Circuit Judge, dissenting.  I write separately because I believe that it is undisputed, from Elam's own deposition, that Dr. Breeding provided Elam with information from which Elam *should have discovered* Dr. Menzies' potential malpractice.  Since I believe that the relevant content of these statements is not actually in dispute, and that these statements were sufficient to trigger the statute of limitations, I would find that there is no factual dispute and that summary judgment was appropriate, and I would affirm the district court's decision.

Initially, I agree with the majority that Kentucky's discovery statute applies, and that it can be triggered either by what the plaintiff subjectively knew or – more importantly in this case – by what the plaintiff objectively should have discovered.  KY. REV. STAT. ANN. § 413.140(2); *Wiseman v. Alliant Hosps., Inc.*, 37 S.W.3d 709, 712 (Ky. 2000) (noting that the "knowledge necessary to trigger the statute is two-pronged; one must know: (1) he has been wronged; and, (2) by whom the wrong has been committed").  Furthermore, I agree that where there is an issue of disputed fact as to when the plaintiff discovered or should have discovered his cause of action, that factual issue should be resolved by the jury.  *Lynn. Min. Co. v. Kelly*, 394 S.W.2d 755, 759 (Ky. 1965); *see also* Fed. R. Civ. P. 56(c).  However, "[w]here the pertinent facts are not in dispute, the validity of the defense of the statute of limitations *can and should* be determined by the court as a matter of law."  *Lynn*, 394 S.W.2d at 759 (emphasis added).

Here, applying the *objective standard* required by Kentucky's discovery statute, the facts show that summary judgment should be granted as a matter of law.  Initially, the majority acknowledges that "Elam's recollection of the conversation with Dr. Breeding contains statements from which a reasonable juror could find that Elam should have discovered Dr. Menzies' potential malpractice." (Majority Op. at 6.)  The majority opinion then goes on to quote from Elam's deposition, which provides what I believe to be the critical statement by Dr. Breeding:

Q.  Do you remember what you were told about the results of the cardic cath?

A.  The results of the cath?  *I just remember that he told me that some stents were placed in a place that shouldn't [sic] have been placed. And that was the result, that I was going to have to have open heart surgery.*

Q.  All right.  Who told you that?

A.  Dr. Breeding.

(Elam Dep. 104 (emphasis added).)  This statement clearly shows that Elam recollected that Dr. Breeding, a medical expert, informed him that the stents, which Elam knew had been inserted by Dr. Menzies, had been improperly placed.  As a result, he was going to have to have bypass surgery.  The language Elam recollected Dr. Breeding using was simple and unambiguous, and Dr. Breeding clearly found fault with the procedure that Dr. Menzies had undertaken.  At this point, regardless of what he subjectively understood, Elam should have discovered Dr. Menzies' potential malpractice, which triggered the Kentucky discovery statute.

Confronted with this unambiguous language, the majority seeks to create a factual dispute by pointing to three other statements in Elam's deposition.[1]  However, none of these statements undermine what Elam should have discovered after hearing Dr. Breeding's clear comments, and since Kentucky applies an objective, not just a subjective, standard, what Elam *should have discovered* is the critical inquiry.  In the first statement, Elam was asked, "[d]id you form a belief that your problems that you started experiencing in August 2005 were related to something that Dr. Menzies had done, or not done, in his care of you," to which he replied: "No, I didn't form a belief at all.  My wife and I talked to it in detail, you known, about that I could have had more blockage.  And we didn't have a clue, you known, what was going on."  (Elam Dep.

_____

[1]The majority notes that, "a juror could find that Elam should not have discovered Dr. Menzies' potential malpractice because he reasonably believed that he needed open heart surgery because the stents had become obstructed by blockage through no fault of Dr. Menzies."  (Majority Op. at 6.)  Initially, I note that our inquiry centers around what a reasonable jury, not just any hypothetical juror, could find.  More importantly, once Dr. Breeding, a medical expert who had just examined Elam, told Elam, in clear and unambiguous language that a reasonable person would have understood, about Dr. Menzies' potential malpractice, Elam could not simply ignore or disregard that information.  To ignore or disregard it would have made any belief to the contrary unreasonable, not reasonable as the majority implies.  Furthermore, from this information, Elam should have discovered Dr. Menzies' potential malpractice, which is all that is required to trigger the Kentucky statute of limitations.

108.)  In the second statement, Elam was asked if, "[a]round the time that you had your bypass surgery, did you suspect that Dr. Menzies may have done something wrong in how he cared for you in July and August," to which he replied: "I didn't never suspect. I told you that I thought the world of Dr. Menzies."  (Elam Dep. 107.)  Clearly, both of these statements go to Elam's subjective beliefs, to what he personally believed about Dr. Menzies and, in particular, to whether he subjectively believed that Dr. Menzies committed malpractice.  However, the Kentucky discovery statute can be triggered by what Elam should have discovered, not simply by what he subjectively believed.  Here, Dr. Breeding's comments, as recollected by Elam, clearly informed Elam that Dr. Breeding, an expert, believed that the stents had been incorrectly placed.  After hearing these comments, Elam should have discovered Dr. Menzies' potential malpractice.

Furthermore, the majority also points to a third statement, in which Elam was asked, "I thought you said something, like, the stents had been put in the wrong place," to which he replied:

> A.  Well, [Dr. Breeding] said they were placed -- I can't -- the main artery comes down, and then he said when you've got two vessels going together, that you can't place two stents together, some way or another. He used medical terms, and I didn't understand all the medical terms or whatever, you know.
> Q.  Okay.  Did you understand this physician to be critical of what Dr. Menzies had done with the stents?
> A.  He seemed to be, a little bit.

(Elam Dep. 106.)   To trigger the Kentucky discovery statute, Elam needed to be put on notice of Dr. Menzies' potential malpractice, not of the medical specifics that created the potential malpractice.  The fact that Elam did not understand all the medical terms or exactly how Dr. Breeding believed that the stents had been misplaced is both to be expected and irrelevant.  Elam was neither a doctor nor an expert in cardiology, that is why it was so important that Dr. Breeding inform him that the stents had been wrongly placed.  Dr. Breeding was the expert, and Dr. Breeding was able to and did explain, in clear and unambiguous terms, that he believed that the stents had been "placed in a place that shouldn't [sic] have been placed."  (Elam Dep. 104.)  Furthermore, at the end of this

statement, Elam again acknowledged that – ultimately – he understood that Dr. Breeding was critical of Dr. Menzies' stenting procedure.

Similarly, the testimony of Elam's son and wife does not refute what Elam should have discovered based on his recollection of Dr. Breeding's comments. Elam's son, Wesley, stated that:

> I'm wanting to say that he said that the stint [sic] was placed in the wrong place to start with, that was what would cause this blockage to occur. That's the best of my knowledge. The way I, I was shaking. I was scared. But I'm pretty sure that that's what he said because I mean my brain was just going 100 different ways. I mean I didn't know what to do.

(Wesley Elam Dep. 18-19.) To the best of his knowledge, Perry Elam *confirmed* that Dr. Breeding told Elam of Dr. Menzies' potential malpractice. Perry Elam's imperfect recollections do not create a factual dispute. Elam's wife, Randi, also testified that she was not sure if Dr. Breeding was "saying that the stints [sic] were contributing to the problem or taking, had not taken care of the problem." (Randi Elam Dep. 49.) Initially, both of these statement suggest that there was something wrong with the stenting procedure. However, Randi Elam did not recollect exactly what Dr. Breeding said and, unlike her husband, could not remember the conversation clearly. Her unclear recollections do not undermine or dispute Elam's clear recollections of Dr. Breeding's comments that the stents had been "placed in a place that shouldn't [sic] have been placed." (Elam Dep. 104.) Furthermore, regarding Elam's malpractice claim, it is what he knew or should have discovered that provided the critical information. Elam recollected, more clearly than his wife or his son, that Dr. Breeding had told him that the stents had been incorrectly placed.

In short, I believe that the majority fails to undertake the objective inquiry into what Elam should have discovered that Kentucky law requires. Indeed, the majority notes that, "[i]n light of Elam's repeated testimony that he did not think he had been wronged, a jury should decide when the statute begins to run." (Majority Op. at 11.) I agree that there is evidence that Elam subjectively "did not think" that he had been

wronged. But Kentucky law demands that we examine not only what Elam thought but also what he should have discovered. I believe that it is undisputed that Elam should have discovered Dr. Menzies' potential malpractice after Dr. Breeding's comments, and he did not need to be a medical expert to do so – Dr. Breeding was the expert and he told Elam of Dr. Menzies' potential malpractice in clear, easily understandable terms. Since what Elam should have discovered is undisputed, summary judgment was appropriate.

The majority also faults Dr. Menzies for not deposing Dr. Breeding. However, Dr. Menzies already had testimony from Elam's own mouth clearly stating what he recollected that Dr. Breeding had told him about Dr. Menzies' potential malpractice. As discussed above, nothing in the record disputed what he should have discovered from these statements. It is what Elam knew or should have discovered that triggered the Kentucky discovery statute. Since Elam provided clear testimony of what Dr. Breeding told him, from which he should have known of Dr. Menzies' potential malpractice, it would have been superfluous for Dr. Menzies to also depose Dr. Breeding.[2] Indeed, because Elam had provided such unfavorable testimony during his deposition, and

---

[2]The only Kentucky case that the majority cites to for the proposition that Dr. Menzies should have deposed Dr. Breeding, *Welch v. L.R. Cooke Chevrolet Co.*, 236 S.W.2d 690, 691-92 (Ky. 1950), involved the failure to call the *only* witness closely associated with the origins of a fire at an automobile repair shop. Unlike that case, Dr. Breeding was not the only, or even the critical, witness to the conversation that triggered the Kentucky discovery statute. Instead, Elam, along with his family, were also participants and witnesses to the conversation. Furthermore, Elam was the critical witness because it is what Elam knew or should have discovered that triggered the Kentucky discovery statute. Therefore, *Welch* is not applicable here. The other cases and authorities that the majority cites to are also inapplicable because, as noted above, Dr. Breeding would have testified to the same conversation that Elam recollected; therefore, his testimony would have been cumulative and inferior to the critical testimony that Dr. Menzies already had from Elam himself. *See* 2 J. WIGMORE, EVIDENCE 202-03 (J. Chadbourn, ed. 1979) ("[I]t seems plain that possible witnesses whose testimony would be for any reason comparatively *unimportant*, or *cumulative*, or *inferior* to what is already utilized, might well be dispensed with by a party on general grounds of expense and inconvenience, without any apprehension as to the tenor of their testimony.") (emphasis in original); 2 MCCORMICK ON EVIDENCE § 264 (noting that "if the testimony of the witness would be merely cumulative, the inference is unavailable" and that "[t]he possibility that the inference may be drawn invites waste of time in calling unnecessary witnesses or in presenting evidence to explain why they were not called. Failure to anticipate that the inference may be invoked entails substantial possibilities of surprise."); *see also Kostelec v. State Farm Fire & Cas. Co.*, 64 F.3d 1220, 1229 (8th Cir. 1995) (insurance company in a dispute over whether the claimant caused the fire leading to the claim through arson failed to call as a witness the person who initially saw smoke emanating from the building and reported the fire and who, therefore, possessed unique, non-cumulative information).

because Dr. Breeding was equally available**3** to both parties, it seems that Elam, if anyone, should have deposed Dr. Breeding.

The majority's reliance on the unpublished decision of the Kentucky Court of Appeals in *Van Landingham* is also misplaced. *Van Landingham v. Georgia Pacific Corp.*, No. 2007-CA-002601-MR, 2009 WL 2475258 (Ky. App. Aug. 14, 2009). In *Van Landingham*, there was a dispute as to when *Van Landingham* discovered that asbestos may have caused his health problems. *Id.* The majority points out that Van Landingham's surgeon and primary physician both had evidence suggesting that Van Landingham was informed of the possibility that asbestos caused his health problems. (Majority Op. at 9.) However, critically, the surgeon stated that "he could not specifically remember if he spoke with Van Landingham" about the possibility that asbestos caused his health problems and the primary physician had placed a question mark next to the comments in his chart indicating that asbestos may have caused Van Landingham's health problems and actually stated that, "he could not be sure that Van Landingham [instead of the surgeon] had personally relayed the information to him." *Van Landingham*, 2009 WL 2475258, at *1-*2. Thus, neither of these witnesses could provide definitive evidence as to what information had been provided to Van Landingham during the critical time period. Furthermore, Van Landingham himself did

---

**3**The majority states that, "a witness is not considered 'equally available' if, as in this case, the witness has special knowledge of relevant facts for the party with the burden of proof." (Majority Op. at 7 (citing *Welch,* 236 S.W.2d at 691-92).) I do not think Dr. Breeding had special knowledge of the relevant facts in this case because Elam (and his family) were also present for this conversation and our inquiry revolves around what was actually said to Elam and what Elam should have discovered. However, I also disagree with this characterization of when a witness is not considered "equally available." *Welch* does not discuss when a witness is equally available and involved a former employee of the defendant, who had unique, non-cumulative knowledge. *Welch*, 236 S.W.2d at 691-92. Furthermore, as Judge Merritt has previously noted, Kentucky follows "the general rule that a witness is not considered 'equally available' if he is presumptively interested in the outcome or if his relationship to one party would reasonably be expected to make his testimony naturally more favorable to that party." *Welsh v. United States*, 844 F.2d 1239, 1245 (6th Cir. 1988) (citing Kentucky cases for this proposition and involving a witness who, as a doctor who was employed by the defendant hospital, was not equally available to both parties); *see also* 2 McCormick On Evidence § 264 ("If a witness is "equally available" to both parties, courts often state that no inference springs from the failure of either to call the witness. This statement can hardly be accurate, as the inference may be allowed when the witness could easily be called or subpoenaed by either party. What is meant instead is that when the witness would be as likely to be favorable to one party as the other, no inference is proper.") (citations omitted). Here, Dr. Breeding was Elam's physician, and there is no reason to believe that Dr. Breeding was presumptively interested in the outcome. Furthermore, there is no reason – other than Elam's own deposition testimony – to believe that Dr. Breeding's testimony would be more favorable to Dr. Menzies than to Elam. Therefore, I believe that Dr. Breeding was equally available to both Elam and Dr. Menzies.

not provide direct evidence that he had been informed of the asbestos at a time when it would have caused the Kentucky discovery statute to run.  *Id.* at *2-*3 (filing an affidavit stating that, in the relevant time period, "he had not been diagnosed with nor did he suspect that he suffered from asbestosis or any other disease caused by asbestos exposure").  In contrast, in this case, Elam provided direct evidence of the information he received from Dr. Breeding: he specifically stated in his deposition that he had been told by Dr. Breeding that the stents were "placed in a place that shouldn't [sic] have been placed," at a time early enough to trigger the Kentucky discovery statute and bar his claim.  (Elam Dep. 104.)  As noted above, none of the other evidence disputes this.  Thus, it is simply inaccurate for the majority to claim that, "[t]he defendant in *Van Landingham* presented far more evidence that the plaintiff should have known of his injury than Dr. Menzies has proffered here."  (Majority Op. at 9.)  Rather, in contrast to the defendant in *Van Landingham*, Dr. Menzies provided undisputed testimony from Elam's own mouth from which Elam clearly should have discovered Dr. Menzies' potential malpractice on a date which would have caused the discovery statute to run.

I do not find any dispute of material fact as to when or whether Elam should have discovered Dr. Menzies' potential malpractice because Elam's own deposition reveals that he remembered Dr. Breeding clearly telling him that the stents were incorrectly placed on October 20, 2005; therefore, summary judgment was appropriate. Consequently, I would affirm the district court's decision.